

Signed and Filed: October 2, 2019

_____
**DENNIS MONTALI**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>ANTHONY BLAKE PERKINS,<br><br>        Debtor.<br>_____<br>CUCKOO'S NEST CLUB, LLC, and<br>BOOTUP VENTURES, LLC,<br><br>        Plaintiffs,<br><br>v.<br><br>ANTHONY BLAKE PERKINS,<br><br>        Defendant.<br>_____ | Bankruptcy Case No. 18-30089-DM<br><br>CHAPTER 7<br><br><br><br><br>Adversary Case No. 18-03023-DM |

**MEMORANDUM DECISION ON COMPLAINT
TO DETERMINE NONDISCHARGEABILITY OF DEBTS**

I.    INTRODUCTION

    On April 30, May 1 and May 16, 2019, the court conducted a trial on the complaint filed by plaintiffs Cuckoo's Nest Club, LLC ("CN") and BootUp Ventures, LLC ("BU") and collectively with CN, "Plaintiffs", against defendant Anthony Blake Perkins

-1-

("Perkins"). Plaintiffs appeared and were represented by David P. Nemecek, Esq; Perkins appeared in propria persona.

Following the submission of post-trial briefs by both sides, the court took the matter under submission. For the reasons that follow, CN will be awarded a judgment of nondischargeability under 11 U.S.C. § 523(a)(6) against Perkins in the amount of $665,045. In reaching this decision the court points out the considerable difficulty its task was in working through confusing and sometimes incomplete or inconsistent exhibits, including spreadsheets and demonstrative summaries and testimony of the witnesses. While the cost may have been prohibitive for Plaintiffs given the losses they have suffered to date on this failed enterprise and lengthy litigation in two courts, the simple fact is that a comprehensive forensic analysis might have produced a different result. Be that as it may, the court has attempted to glean from the record the basis for the result it reaches.[1]

BU will take nothing by the complaint. Further, the court will not impose any alter ego liability on Perkins, nor award any prejudgment interest or punitive damages. CU is entitled to its costs.

---

[1] Plaintiffs contended emphatically that Perkins spoiled evidence or otherwise engaged in conduct that should have resulted in a more severe result. The evidence does not support such a finding. Even if it did, there is nothing to suggest that the consequence would be different.

The court has previously expressed its apology for the delay in announcing this result and nothing more needs to be said.

Because neither Perkins or his Chapter 7 trustee have asserted any claims for affirmative relief or offset against Plaintiffs, the court will afford no relief, nor devote any further time or attention, to Perkins' arguments that payments made by CN or BU to its owners should be recovered, that their receipt should be explained or that Plaintiffs must be held accountable for unexplained transactions involving CN or BU.

II. BACKGROUND[2]

The historical events that brought the parties together are largely undisputed and are briefly summarized. Perkins is the principal and controlling person and owner of AlwaysOn, Inc. ("AO"). BU is in the business of aiding startup companies. Its principals are Marco ten Vaanholt ("ten Vaanholt") and Mukul Agarwal ("Agarwal"). In 2014, Perkins became acquainted with ten Vaanholt and Agarwal at a business location in Menlo Park, California, leased by BU. Perkins expressed an interest in using outdoor space at that property for various of his own business purposes. In time ten Vaanholt discussed the venture that ultimately led to the formation of CN on or about September 4, 2014. CN was jointly owned by BU and AO, who were fifty percent interest owners and its two managing members. Perkins signed the operating agreement and a management agreement for CN on behalf of AO in November, 2014. While the management agreement did state in Paragraph 2.3 that Perkins would be entitled to 30% commission on membership and sponsorship sales that he generated, it further provided in Paragraph 2.8 that he

---

[2] The following discussion constitutes the court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052(a).

-3-

would defer payment of those commissions until requisite cash reserves had been realized and the commission could be paid from net profits.

The business plan of the founders was to recruit members and corporate sponsors to participate in a social club catering to entrepreneurs, financiers, and artists in Silicon Valley. At that social club the members would have an opportunity to network with one another and explore potential business opportunities. There were four types of memberships for differing enrollment amounts, and one type of corporate sponsorship, also in differing amounts

Prior to forming CN, Perkins on the one hand and ten Vaanholt and Agarwal on the other had no prior business dealings with one another. The business appears doomed from the outset despite initial interest from prospective members and sponsors. From the very beginning of their relationship, AO was almost perennially cash poor. That situation had to be a red flag for CN and its principals. It also appears that some of the basic concepts of how they were to conduct their business was never fully explored. For example, Perkins and AO were obligated to turnover to CN cash revenues obtained from potential members and sponsors "immediately or, at a minimum, no later than two weeks after receipt." And even then, the consequence to AO for late payment was the accrual of interest at 12%, not termination of the relationship. Clearly, therefore, Perkins and AO had unfettered temporal control of all revenues designated for CN from prospective members and sponsors. He and AO were not prohibited from comingling those revenues from any other of

their revenue sources. Most revenues from members and sponsors came into AO via an online account AO controlled.

On the other hand, ten Vaanholt and Agarwal adamantly refused to guarantee a $10 million line of credit provided to AO by its merchant bank because the CN's business was a new business. Later on Perkins complained vociferously about the refusal of those two to provide that guarantee but he was charged with knowledge of their position from the outset. After-the-fact complaints are as hollow as their complaints about his freedom to comingle cash revenues for at least two weeks without consequences. There also appears to be a history of disagreement among the parties about myriad other business matters

The stories depart and remain unresolved concerning: was Perkins entitled to a salary for his services to AO[3]; was he entitled to withhold payments of revenues designated for CN on an account of commissions he earned; was AO entitled to collect and commingle non-CN revenues with those of CN; were rents or loans allowed to be paid or repaid by CN to BU?

CN's exhibits reflect that in 2014 AO transferred $140,000 to CN, compared to total receipts of $591,000, creating a shortfall of $451,000.

By August 30, 2015, CN was in desperate need of funds. Nonetheless, in June 25, 2015, the parties executed a license

---

[3] A July 10, 2012 letter agreement between Perkins and AO (signed by Perkins) says he would be paid $425,000 annually. There is no proof that Plaintiffs knew of this agreement. In any event, Perkins apparently did not pay himself a salary from CN's entitled receipts.

-5-

agreement obligating CN to pay $33,000 per month rent to BU; $21,000 per month was to be deferred.

As of the third quarter of 2015, ten Vaanholt suspected that AO was not turning over all revenues to CN. He was aware of a $100,000 shortfall at that time. Part of his concerns were based on reports from members who had paid for their memberships that were not reflected in CN's records.

As of August 30, 2015, ten Vaanholt estimated a total shortfall of $866,785 received by AO but not remitted to CN.

By mid November 2015, ten Vaanholt asserted in writing that AO was in breach of the operating agreement. On December 15, 2015, he terminated AO's membership in CN.

Subsequently Plaintiffs filed an action against AO in San Mateo Superior Court against AO and obtained a default judgment for $3.7 million. Perkins was not named as a defendant.

Perkins filed Chapter 7 on January 25, 2018.

III. DISCUSSION

    A. <u>Nondischargeabiliy under 11 U.S.C. § 523(a)(2).</u>

Plaintiffs properly summarized the applicable law to determine whether Perkins' liability to either of them is nondischargeable under Section 523(a)(2). The burden is on the creditor to establish all five elements of that section, namely fraudulent omission or deceptive conduct; knowledge of the falsity by the defendant; an intent to deceive; justifiable reliance by the creditor, and damages. Here there is no question that CN has suffered damage. Beyond that, Plaintiffs have not established that they justifiably relied upon any such

-6-

falsity or deceptiveness on the part of Perkins that led to their losses.

The reason the court reaches this conclusion is found not only in the specific dearth of evidence presented on this issue, but also based upon having observed ten Vaanholt and Perkins at trial and drawing upon its own experience with participants to failed business ventures. This case is not about stealth and deceit, fraud and deception, but more about a business attempt that was ill conceived, primarily because neither side had done its necessary due diligence to know with whom they were getting involved. At the outset, the three people involved were attempting to build a profitable business enterprise. The fact that it failed, that the Plaintiffs suffered substantial losses and Perkins ended up in bankruptcy does not mean that Perkins knowingly and intentionally set out to defraud ten Vaanholt and Agarwal and their business entities, nor did they justifiably rely in any way on any intentional misrepresentations.

More specific with reference to the course of dealing, before the management agreement was even executed in May, 2015, AO already owed CN approximately $630,000. To repeat what was just said, this is more consistent with a failed venture rather than intentional wrongdoing against innocent victims. Stated otherwise, there simply was none of the normally required elements of intentional fraud, conduct or deceit by Perkins that would support findings and conclusion of nondischargeability under 11 U.S.C. § 523(a)(2).

//
//

-7-

B. Nondischargeability under 11 U.S.C. § 523(a)(6).

Plaintiffs also accurately summarized the necessary elements they must prove to establish nondischargeability of any of their claims under Section 523(a)(6). Specifically, they must establish that Perkins' conduct was willful and malicious. Willful means that Perkins had a subjective motive to inflict injury or believed or should have believed that the injury was substantially certain to result from his own conduct. In addition, the injuries must be willful, namely done intentionally, necessarily causing injury, and done without just cause or excuse.

Consistent with the court's observation about the failed joint venture by the parties, the evidence does not support the conclusion that the failure of CN translates generally to personal liability of a debtor in bankruptcy for willful and malicious injury. But it does, however, implicate Perkins' liability for what must be characterized as the wrongful appropriation or conversion of monies that he knew should be turned over to CN but in fact were kept for his own or AO's purposes. More specifically, the evidence establishes that Perkins had no justification whatsoever for paying himself commissions from the funds AO received and was obligated to remit to CN.

The same conclusion follows from Perkins' credit for bank charges, what CN established were double booked fees, and the remaining amount Perkins conceded in the post-trial brief was an unexplained balance.

-8-

The court finds that Perkins knowingly and intentionally converted revenues collected that should have been turned over to CN.  For that reason, the court concludes that a portion of CN's claim is nondischargeable under § 523(a)(6).  To put these issues to rest, the court resolves the matters as follows:

Claimed by BU:

Lost rent and unpaid loans ($589, 337) – DISALLOWED.  These amounts may not be recovered from Perkins under any theory because there is no satisfactory proof to lead the court to find that he knowingly or intentionally "converted" any of those amounts.

Claimed by CN:

| | |
|---|---:|
| Total of memberships and sponsorships collected by AO: | |
| $1,051,500 plus $435,500 = | $ 1,487,000 |
| Less collections turned over to CN: | $ (360,465) |
| Shortfall: | $ 1,126,535 |
| Less direct collection from Jeffries | $ (25,000) |
| Net claim: | $ 1,101,535 |
| | |
| The court accepts Perkins' explanation (Post-trial brief, P. 11) of $ 142,500 direct investments in AO and $ 256,250 AO-only sponsorship events resulting in a credit of: | $ (398,750) |
| Adjusted Net Claim: | $ 702,785 |
| Credits asserted by Perkins but disallowed by court: | |
| Commissions | $ 226,960 |
| Bank charges | $ 22,656 |

|  |  |
|---|---:|
| Alleged double booked fees | $ 294,967 |
| Outstanding unexplained balance | $ 120,462 |
| Total non-dischargeable claim | $ 665,045[4] |

That said, and as noted at the outset, Perkins' contention that any of his conduct was justified by other conduct by Plaintiffs is misplaced and is rejected.

C. <u>Perkins is not the alter ego of AO.</u>

Plaintiffs have not even come close in establishing that Perkins is the alter ego of AO and that he is liable for any amount in excess of what the court awards here. In particular he is not liable on account of the default judgment Plaintiffs have obtained against AO. In their post-trial brief, Plaintiffs recite the familiar litany of elements to establish alter ego, including commingling funds, treatment by an individual of assets of a corporation as its own; failure to follow corporate formalities; failure to adequately capitalize a corporation, and diversion of assets to the detriment of creditors. The problem is that Plaintiffs have not established by admissible and competent evidence any of those elements. Whatever commingling Perkins may have caused pertains to revenues of AO that were or were not earmarked for CN, but none from his own personal sources. Similarly, he has not treated his own personal assets of as those of AO (or CN). Further, there was no evidence that

---

[4] The court cannot reconcile the remaining small difference between the Net Claim of $ 1,101,535, the allowed credits of $398,750 and the non-dischargeable amount of $665,045. It resolves that difference in Perkins' favor as consistent with his entitlement to a fresh start even though he remains saddled with a sizeable amount of non-discharged debt.

-10-

he individually ignored corporate formalities on behalf of his entity, AO, nor that AO was inadequately capitalized or that Perkins diverted assets from that entity to the detriment of creditors of that entity.[5]

IV. CONCLUSION

For the reasons summarized above about the nature of the relationship among the principals and the inability of Plaintiffs to persuade the court that Section 523(a)(2) has been implicated, the court will not impose punitive damages on Perkins as requested. There is simply no showing that his conversion of the amounts awarded establish the traditional elements of malice and oppression that could justify any award of punitive damages.

The court is concurrently issuing a judgment of nondischargeability consistent with this memorandum decision.

**END OF MEMORANDUM DECISION**

---

[5] The court previously dismissed Plaintiffs' cause of action under 11 U.S.C. § 523(a)(4), citing *Double Bogey v. Enea*, 794 F.3d 1047, (9th Cir. 2015). It would appear from the brief that Plaintiffs are trying to revisit that legal analysis and conclusion, but they will not be successful here.

COURT SERVICE LIST

Anthony Blake Perkins
P.O. Box 620454
Woodside, CA 94062

Anthony Perkins
P.O. Box #2
Woodside, CA 94026

-12-